Proposed Hearing Date and Time:  **June 11, 2019 at 12:00 p.m.**
Proposed Objection Date and Time:  **TBD**

CULLEN AND DYKMAN LLP
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
(516) 357-3700
C. Nathan Dee, Esq.
Elizabeth M. Aboulafia, Esq.

*Proposed Special Counsel to Gramercy Group, Inc.*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                               :

In re:                         :    Chapter 11
                               :

GRAMERCY GROUP, INC.       :    Case No. 8-19-73622 (LAS)
                               :
                               :

                Debtor.          :
                               :
------------------------------------------------------------- x

**MOTION OF THE DEBTOR FOR (A) ENTRY OF ORDER SCHEDULING
EMERGENCY INTERIM HEARING AND (B) ENTRY OF INTERIM AND FINAL
ORDERS PURSUANT TO 11 U.S.C. §§105(a), 362, 363, AND 364 (I) AUTHORIZING
POST-PETITION SECURED FINANCING; (II) GRANTING SECURITY INTERESTS
AND LIENS; (III) AUTHORIZING USE OF CASH COLLATERAL; (IV) GRANTING
ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361 AND 364 AND (IV)
SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)**

       Gramercy Group, Inc., the above-captioned debtor and debtor-in-possession ("Gramercy

or the "Debtor"), by and through its proposed special counsel Cullen and Dykman LLP, hereby

submits this motion (the "Motion") pursuant to sections 105, 361, 362, 363 and 364 of chapter 11

of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, et seq. (the "Bankruptcy Code"),

Rules 4001 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and

Rule 4001-5 of the Local Rules of the United States Bankruptcy Court for the Eastern District of

New York (the "EDNY Bankruptcy Rules") as supplemented by the Guidelines for Financing

Motions adopted by the United Stated Bankruptcy Court for the Eastern District of New York on

April 15, 2010 (the "Financing Guidelines" and, together with EDNY Bankruptcy Rules, the "Local Rules") for: (i) entry of an order scheduling an emergency interim hearing; (ii) entry of an interim order (the "Interim Order") substantially in the form annexed hereto as <u>Exhibit "1"</u> (a) authorizing Gramercy to obtain secured post-petition financing up to the aggregate amount of four million ($4,000,000) dollars (the "DIP Facility") pursuant to the terms and conditions of that certain Financing Agreement, by and among Gramercy, Vincent Parziale, individually, Joanna Parziale, individually, 3000 Burns Avenue Associates LLC ("3000 Burns") and Gramercy Wrecking & Environmental Contractors, Inc. ("Gramercy Wrecking" and, together with Gramercy, Vincent Parziale, Joanna Parziale and 3000 Burns, the "Indemnitors") as borrowers and Everest Reinsurance Company and Everest National Insurance Company ("Everest"), as lender (the "DIP Financing Agreement")[1], a copy of which is annexed hereto as <u>Exhibit "2"</u>[2]; (b) authorizing the immediate funding under the DIP Financing Agreement in the aggregate amount of seven hundred fifty thousand ($750,000) dollars on an interim basis in order to avoid immediate and irreparable harm to Gramercy's estate; (c) granting Everest, pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority, perfected and indefeasible lien on and security interest in (the "Everest Bonded Contracts Lien") all of the proceeds of the Everest Bonded Contracts including, without limitation, property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code and, hereinafter, "Cash Collateral"), subject to the Everest Carve-Out (defined herein) and valid construction trust fund obligations; (d) granting Everest, pursuant to

---

[1] Capitalized terms used herein, but not otherwise defined, will have the meaning ascribed to them in the DIP Financing Agreement and/or the Parziale Declaration, as applicable.

[2] The form of DIP Financing Agreement which Gramercy intends to file with the Court on June 7, 2019 is currently unexecuted and represents the most recent version which remains subject to further review and approval by all parties thereto.  Gramercy is conferring with the parties in interest in this chapter 11 case and anticipates filing an amended form of DIP Financing Agreement reflecting further comments from the parties to the agreement as well as other parties in interest in this chapter 11 case.

section 364(c)(3) of the Bankruptcy Code, a second priority, perfected and indefeasible lien on and security interest in all other personal property assets owned by Gramercy (the "Second Lien"); (e) authorizing Gramercy's use of Cash Collateral on the terms and conditions set forth in the DIP Financing Agreement and the Interim Order; and (f) granting adequate protection to Bank of America, N.A. ("BOA" or the "Bank"); and (iii) scheduling a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") authorizing any requested relief not granted under the Interim Order on a final basis.

As set forth more fully in the DIP Financing Agreement, the terms thereof and the Collateral provided by Gramercy and certain non-debtor Indemnitors thereunder represent not only security for amounts advanced under the DIP Facility, but also consideration for Everest's execution or consideration of the execution of surety bonds. Given the critical importance of obtaining liquidity and bonding for future work, Gramercy submits that entry into the DIP Financing Agreement is in the best interest of the estate and all creditors.

For the avoidance of doubt, and consistent with the relief granted on an interim basis in connection with the Cash Collateral Motion, all of the relief requested herein is subject to any valid rights under certain statutory and/or contractual trusts to the extent provided for under applicable non-bankruptcy law, including, without limitation and all to the extent valid, trusts under (a) Article 3-A of the New York Lien Law, (b) contracts bonded by Arch or Everest, or (c) indemnity agreements executed by Gramercy (and others) in favor of Arch or Everest, as well as Arch's and Everest's respective rights of equitable subrogation, if any. In addition, the Everest Bonded Contracts Lien and the Second Lien is subject to the Everest Carve-Out on terms to be agreed to by the parties and/or otherwise ordered by the Court.

In support of the Motion, Gramercy will rely on a declaration of Vincent Parziale in support of the Motion (the "DIP Declaration")[3] and respectfully represents as follows:

## INTRODUCTION

1.      On May 17, 2019 (the "Petition Date"), Gramercy filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.

2.      Gramercy has remained in possession of its property and continues in the operation and management of its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      No official committee of unsecured creditors has been appointed by the Office of the United States Trustee for the Eastern District of New York in this chapter 11 case.

4.      On the Petition Date, Gramercy filed the Declaration of Vincent Parziale pursuant to Local Bankruptcy Rule 1007-4 (the "Parziale Declaration" at Dkt. No. 13) which sets forth a detailed factual background of Gramercy's business and operations, as well as the events leading to the filing of this chapter 11 case.  In further support of this Motion, Gramercy relies on the Parziale Declaration, the terms of which are incorporated herein by reference.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6.      The statutory predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 4001 and 6004 and Local Rule 4001-5.

---

[3] Gramercy intends to file the DIP Declaration with the Court in advance of any emergency hearing on this Motion.

<u>STATEMENT PURSUANT TO BANKRUPTCY RULE 4001(C)</u>

7.      Pursuant to Bankruptcy Rule 4001, the following sets forth a statement of the material provisions of the DIP Facility and Interim Order[4]:

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| **Parties**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)] | <u>Borrower</u>:       Gramercy Group, Inc., Vincent Parziale, Joanna Parziale, 3000 Burns Avenue Associates LLC and Gramercy Wrecking &Environmental Contractors, Inc.<br><br><u>Lender</u>:       Everest Reinsurance Company and Everest National Insurance Company<br><br>[DIP Financing Agreement at preamble] |
| **Amounts**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Financing Guidelines 1 (a) and (b)] | The DIP Facility will provide Gramercy with financial assistance in an amount not to exceed $4,000,000. Everest will make an Initial Advance in the amount of $750,000 for the period through and including July 12, 2019.<br><br>[DIP Financing Agreement, ¶ F; Interim Order ¶ _]<br><br>Everest will consider Gramercy's Initial Funding Advance and Funding Requests in the amounts set forth in Gramercy's Budget, which funds shall be deemed to be reimbursable losses pursuant to the Indemnity Agreement. The Budget shall be updated by Gramercy every two (2) weeks or at such other intervals as shall be agreed to by the Parties and shall estimate the cash needs of Gramercy for the first two (2) week period reflected in the Budget.<br><br>[DIP Financing Agreement, ¶ L; Interim Order ¶ _]<br><br>Interim authorization pending Final Hearing:  [$750,000]<br>[Interim Order ¶  ] |
| **Purpose** | |

---

[4] This statement is qualified in its entirety by reference to the applicable provisions of the DIP Financing Agreement or the Interim Order, as applicable.  To the extent there exists any inconsistency between this statement and the provisions of the DIP Financing Agreement and the Interim Order, the provisions of the DIP Financing Agreement shall control over the statement, and the Interim Order shall control over the DIP Financing Agreement.

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| [Fed. R. Bankr. P. 4001(c)(1)(B)] | Gramercy has an immediate need to obtain the DIP Facility to provide additional liquidity to continue to perform work in connection with its Projects to all obligees under the Everest Bonded Contracts. Gramercy also desires to obtain certain surety bond associated with the DIP Facility to continue bidding on construction projects in the future. Through the DIP Facility, Gramercy will be provided with sufficient funding to continue its operations and maintain the liquidity needed for the Everest Bonded Contracts and the Non Bonded Projects.<br><br>[DIP Financing Agreement, ¶ E; Interim Order ¶ __] |
| **Maturity & Termination**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)] | The DIP Financing Agreement shall terminate upon the later to occur of: (a) the Plan Effective Date; or (b) the date of indefeasible payment in full of all obligations due under the DIP Financing Agreement; but in any event not later than one (1) year from the Effective Date of the DIP Financing Agreement, unless otherwise extended in writing by the parties thereto.<br><br>[DIP Financing Agreement, ¶ W] |
| **Limitations on Funding Obligations**<br><br>[Financing Guidelines 1 (h)] | All financing provided by Everest to Gramercy in the DIP Facility shall be used for the Permitted Uses which include:<br><br>(i)    payments to be made to subcontractors, suppliers, laborers, and/or labor union fringe benefit funds which have provided and/or which may hereafter provide material and/or labor to or on behalf of Gramercy in furtherance of the Everest Bonded Projects;<br>(ii)    payments to be made for the purpose of funding Gramercy's payroll costs relative to the Everest Bonded Projects and other expenses relating to the Everest Bonded Projects including, without limitation equipment and transportation costs relating to the Everest Bonded Projects;<br>(iii)    payments to be made to Gramercy for Gramercy's own cost for that part of the work on the Everest Bonded Contracts hereafter performed by Gramercy with its own forces; and<br>(iv)    payment of Gramercy's documented customary and usual overhead and general administrative expenses reasonably incurred by Gramercy in connection with its operations I am amount that corresponds to the approximate ratio of Everest Bonded Projects to all Projects based upon project revenues (the "Overhead Percentage").<br><br>[DIP Financing Agreement, ¶ M] |

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| | There are no other limitations on Everest's funding obligations. |
| **Events of Default and Effect on Financing**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Financing Guidelines 1 (o)] | Any of the following occurring after the Effective Date of the DIP Financing Agreement that have not been cured by Gramercy within three (3) business days of receipt of written notice from Everest shall constitute a "DIP Financing Default":<br><br>(a) Everest determines that Gramercy has abandoned any Everest Bonded Project or has willfully refused to perform any Everest Bonded Project in a material respect;<br><br>(b) Gramercy has failed to provide Everest with the Budget and Reporting Statement (as those terms are defined in paragraphs L and M of DIP Financing Agreement);<br><br>(c) Gramercy materially breaches any term of the DIP Financing Agreement;<br><br>(d) The Bankruptcy Court enters an order vacating the automatic stay under section 362(a) of the Bankruptcy Code to permit any obligee of a performance bond relative to any Everest Bonded Project to declare Gramercy to be in default and/or to terminate the Everest Bonded Contract for default;<br><br>(e) Gramercy rejects any Everest Bonded Contract in its Chapter 11 proceeding or the Bankruptcy Court enters a final order that precludes or prevents Gramercy from assuming any Everest Bonded Contract;<br><br>(f) Everest determines, in its sole and absolute discretion, that Gramercy has experienced a material adverse change in its operations that cannot be cured by a disbursement(s) from the DIP Facility;<br><br>(g) Gramercy's bankruptcy proceeding is converted from Chapter 11 to Chapter 7, or a Trustee is appointed to operate Gramercy's Chapter 11;<br><br>(h) Gramercy files a Plan of Liquidation or a Plan of Reorganization that does not incorporate the terms of the DIP Financing Agreement, the order(s) approving DIP Financing |

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| | Agreement and/or any further stipulations or agreements related thereto; or<br><br>(i) Gramercy files a Plan of Liquidation or a Plan of Reorganization without the consent of Everest, which consent will not be unreasonably withheld.<br><br>[DIP Financing Agreement, ¶ G] |
| **Interest Rate**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)] | The DIP Facility shall bear interest at the rate of 6.25% per annum. The default rate shall be an additional two (2%) percent payable upon and during the continuance of a DIP Financing Default.<br><br>[DIP Financing Agreement, ¶ X] |
| **Pricing and Economic Terms**<br><br>[Financing Guidelines 1 (c)] | There are no letter of credit fees, commitment fees or other fees under the DIP Facility.<br><br>The reasonable costs and expenses of Everest and its professionals related to the DIP Financing and Indemnity Agreements shall be repaid upon the termination of this Financing Agreement and shall be secured by the Collateral being provided to Everest in conjunction with the DIP Facility. |
| **Conditions**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Financing Guidelines 1 (b)] | All of the Indemnitors agree to execute the DIP Indemnity Agreement, attached to the DIP Financing Agreement.<br>[DIP Financing Agreement, ¶ R]<br><br>Certain Non Debtor parties required collateral pledges:<br><br>1. The interest of 3000 Burns in the Commercial Property, in the amount of $4,000,000, as evidenced and secured by the Commercial Mortgage; the form of Demand Note and Commercial Mortgage are annexed to the DIP Financing Agreement;<br><br>2. The interests of Vincent Parziale and Joanna Parziale in the Residence, in the amount of the lesser of a) $6,000,000 or b) amounts due or to become due from the Indemnitors to Everest under the Indemnity Agreement, as evidenced and secured by the Residential Mortgage; |

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| | [DIP Financing Agreement, ¶ R]<br><br>BOA's written consent to allow 3000 Burns to have a junior mortgage in favor of Everest placed on the Commercial Property, and BOA's written agreement to subordinate its security interest in the proceeds of the Everest Bonded Projects to Everest.<br><br>[DIP Financing Agreement, ¶ S]<br><br>Reaffirmation of the Indemnitors' obligations under the Indemnity Agreements.<br><br>[DIP Financing Agreement, ¶ U]<br><br>Liens and Priorities set forth in ¶ S of DIP Financing Agreement |
| **Liens and Priorities**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)(i)] | Subject to the Everest Carve-Out and the BOA Carve-out, Gramercy grants to Everest, as security for the DIP Facility, a senior secured priming lien, pursuant to section 364(d)(1) of the Bankruptcy Code, solely with respect to the proceeds of the Everest Bonded Contracts and a junior secured lien pursuant to section 364 (c)(3) of the Bankruptcy Code in all other personal assets of Gramercy.  [DIP Financing Agreement, ¶ S; Interim Order ¶¶ ___] |
| **Carve-Out**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Financing Guidelines 1 (e) and 4] | The senior secured priming lien shall be subject to the following carve-outs:<br><br>TBD |

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING ||
|---|---|
| **Release and Waiver of Claims**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)(viii)] | The Indemnitors each acknowledge, represent, warrant and agree that they have no defenses, offsets, or counterclaims to any obligations or liabilities to Everest under the Indemnity Agreement and hereby waive and release all claims and/or defenses against Everest, including all of its affiliates, predecessors in interest, parent corporations, subsidiaries, successors-in-interest, and assigns and all of Everest's present and future directors, officers, employees, agents and attorneys, from any and all claims, causes of action, suits and damages (including claims for attorneys' fees) which any or all of the Indemnitors ever had or now has as of the Effective Date of this Financing Agreement  against any or all of said parties, whether arising out of this Financing Agreement, the Indemnity Agreement, the Bonds, the Everest Bonded Contracts, otherwise.  The Indemnitors further acknowledge that Everest is not a fiduciary in any way with respect to any of the Indemnitors.<br><br> [DIP Financing Agreement, ¶PP] |
| **506(c) Limits**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B )(x)] | TBD<br>[DIP Financing Agreement, ¶Y] |
| **Waiver/Modification Of Automatic Stay**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)(iv)] | To the extent the automatic stay imposed under section 362(a) of the Bankruptcy Code is applicable to any provision of the DIP Financing Agreement, Everest shall be granted relief from the automatic stay to effectuate the terms and provisions of the DIP Financing Agreement.<br><br>[DIP Financing Agreement, ¶ Y] |

## BACKGROUND

A.      **Pre-Petition Secured Credit and Bonding Facilities**

(i)      *The Bank of America Pre-Petition Credit Facility*

8.      Gramercy is party to a pre-petition Loan Agreement (as amended, the "Loan Agreement") with BOA dated January 8, 2016.  Pursuant to the Loan Agreement, BOA made available to Gramercy a revolving line of credit facility in the principal amount of eleven million ($11,000,000) dollars, which includes a two million ($2,000,000) dollar letter of credit subfacility

(collectively, the "BOA Facility").  Monthly interest payments on outstanding draws under the BOA Facility would be equal to the Bank's prime rate (5.5% effective as of December 20, 2018).

9.      The BOA Facility is secured by substantially all of Gramercy's personal property, including its equipment and fixtures, accounts, inventory, and receivables (the "Pre-Petition Collateral").  In addition, the BOA Facility is guaranteed by Gramercy's sole shareholder and president Vincent Parziale and non-debtor affiliates Gramercy Wrecking and 3000 Burns.  3000 Burns also has a separate mortgage with the Bank for the property located at 3000 Burns Avenue, Wantagh, New York from which Gramercy operates its business.

10.     As of the Petition Date, there was approximately five million four hundred thousand ($5,400,000) dollars in outstanding loans and one million seven hundred fifty thousand ($1,750,000) dollars in outstanding letters of credit under the BOA Facility for an aggregate outstanding indebtedness in the amount of approximately seven million one hundred fifty thousand ($7,150,000) dollars.

### (ii)    *The Indemnity Agreements*

11.     Prior to the Petition Date, on or around January 27, 2017, the Indemnitors executed an Agreement of Indemnity in favor of Everest (the "Indemnity Agreement") for the purpose of obtaining bonding for Gramercy's construction operations.  In the Indemnity Agreement, the Indemnitors agreed, among other things, to exonerate, hold harmless, and indemnify Everest from and against any and all liability, loss, costs, damages, fees and expenses incurred by Everest, *inter alia*, as a result of executing various surety bonds to guarantee (i) the performance of various contracts by Gramercy (the "Everest Bonded Contracts") and (ii) the payment of certain obligations of Gramercy with respect to the Everest Bonded Contracts.

12. As of the Petition Date, Gramercy continued to perform work on eighteen (18) Everest Bonded Contracts with a total contract value of over $132 million with significant remaining work in progress to be performed.

13. In addition, Gramercy is currently performing work under contracts for certain non-bonded projects (the "Non-Bonded Projects") and certain projects (the "Arch Bonded Projects") bonded by Arch Insurance Company ("Arch"). Gramercy and the Indemnitors are also party to a General Indemnity Agreement with Arch. Gramercy does not seek to use the DIP Facility to fund any amounts directly or indirectly relating to the Arch Bonded Projects, and the liens and security interests proposed to be granted to Everest herein shall not attach to the proceeds of the Arch Bonded Projects.

**B.    Events Leading to Chapter 11 Filing**

14. As set out more fully in the Parziale Declaration, Gramercy offers a variety of services including general contracting, demolition, and environmental remediation. As of the Petition Date, Gramercy was involved in approximately thirty (30) ongoing projects, half of which are demolition based and the other half are general contracting.

15. Due to the nature of Gramercy's business, the size of Gramercy's workforce varies based on the volume and nature of open construction projects at any given time. As of the Petition Date, Gramercy employed approximately one hundred fifty six (156) individuals in connection with its construction projects and related back office operations. Gramercy funded its business through the proceeds from its construction projects and the liquidity provided by the BOA Facility.

16. As described in the Parziale Declaration, Gramercy experienced net decreases in profitability during the first half of 2018 as a result of Gramercy's transition to general contracting work coupled with increased legal fees incurred in prosecuting an action commenced by Gramercy

against D.A. Builders, LLC  and its principal in the United States District Court for the District of Hawaii (the "District Court Action").

17.     As a result, it was in breach of certain financial covenants under its Loan Agreement.  On October 29, 2018, the Bank sent Gramercy a Reservation of Rights letter which notified Gramercy of its defaults under the Loan Agreement, forbore from taking action at that time, but reserved its rights and remedies with respect to the defaults under the Loan Agreement. Upon learning of the verdict in the District Court Action, the Bank refused to allow Gramercy to take any additional advances under the BOA Facility, which severely hampered its cash flow during the months preceding the Petition Date.

18.     During the period following entry of the verdict and preceding the chapter 11 filing, Gramercy engaged in discussions with BOA regarding entry into a Forbearance and Standstill Agreement while settlement discussions were ongoing, which agreement would have also permitted Gramercy additional access to the BOA Facility.  This agreement was never finalized, and Gramercy has therefore been without access to liquidity under its line of credit with BOA since January 2019.

19.     Furthermore, the Town of North Hempstead is currently withholding approximately $2.8 million for unpaid contract work, retainage, and change orders for a project Gramercy completed, that Gramercy seeks to recoup.  This has further constrained Gramercy's cash position.  For the foregoing reasons Gramercy filed its chapter 11 case to preserve the value of the company for all stakeholders and now requires access to the DIP Facility.

## C.     The Need for Access to the DIP Facility

20.     Gramercy, working with its advisors, has analyzed its cash needs in effort to determine what is necessary to maintain its operations in chapter 11 and work towards a successful

reorganization.   As part of that analysis, Gramercy developed a thirteen (13) week cash flow projection (the "Budget")[5] which lists the operating expenses reasonable expected to be incurred that are within the ordinary course of Gramercy's business.

21.    Gramercy has determined that it has an immediate need for not less than seven hundred fifty thousand ($750,000) dollars on or before June 14, 2019 in order to satisfy its normal operating expenses including payroll, direct project costs, indirect project costs, overhead and other general and administrative expenses.   The immediate funding need for seven hundred fifty thousand ($750,000) dollars (the "Initial Advance") is set forth in paragraph (F) of the DIP Financing Agreement.   Without the Initial Advance, Gramercy will not have the funds that it needs to perform under all of its construction projects, thus placing Gramercy in risk of default under approximately thirty (30) open construction projects.

22.    After payment of the Initial Advance, based on its cash flow projections, Gramercy anticipates that it will have further funding needs which will depend in large part on the collection of receipts on its open construction projects.   The DIP Facility provides up to an addition three million two hundred fifty thousand ($3,250,000) dollars in one or more Subsequent Advances to meet Gramercy's anticipated future liquidity needs.

23.    Based on Gramercy's evaluation of its ongoing construction projects and its efforts to continue to bid on new construction projects, with the support of Everest to issue a critical bond and thereafter consider the execution of future bonds as set forth in the DIP Financing Agreement,

---

[5] A copy of the Budget was annexed to *Debtor's Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. § 361 and 363 (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection, and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* (the "Cash Collateral Motion" at Dkt. No. 7), as updated in the *Notice of Filing of Proposed Order* filed with the Court on June 2, 2019 (Dkt. No. 61).  The Court has approved the Cash Collateral Motion on an interim basis following hearings held on May 21, 2019 and June 3, 2019 (Dkt. Nos. 42 and 66).  A third interim hearing on the Cash Collateral Motion is scheduled for June 11, 2019 at 12:00 p.m., together with hearing on this Motion.

Gramercy believes that the DIP Facility is critical to its operations and ability to successfully continue its chapter 11 case. The DIP Facility will provide Gramercy with the liquidity needed to ensure Gramercy's ability to continue to perform under its approximately thirty (30) open construction projects and satisfy its corresponding liabilities without disruption    In addition, to avoid any liquidity constraints during the early stages of the chapter 11 case when Gramercy's subcontractors and suppliers may be less inclined to honor payment terms that existed prior to the Petition Date, Gramercy requires access to the DIP Facility to ensure an orderly transition into chapter 11 without any attendant disruption to its construction operations.

24.    Accordingly, Gramercy believes that the DIP Facility is essential to provide Gramercy with additional liquidity and assure Gramercy's customers that it can complete its ongoing construction projects to maximize the value of this estate for the benefit of creditors as it seeks to successfully exit chapter 11.

**D.    The DIP Facility Was the Product of Good Faith, Arms' Length Negotiations and Alternative Sources of Post-Petition Financing Are Not Readily Available**

25.    The terms of the DIP Financing Agreement and related documents have been negotiated in good faith and at arm's length among Gramercy and Everest, reflect Gramercy's exercise of prudent business judgment consistent with its fiduciary duties, and are fair and reasonable under the circumstances.

26.    Moreover, Gramercy determined that procurement of a secured loan from a traditional bank lender was likely futile because Gramercy's most significant assets capable of being collateralized are its work in progress on construction projects.  Traditional bank lenders are often wary of providing financing to construction contractors due to the fact that a contractor's receivables are treated as trust fund monies belonging to subcontractors, suppliers, and other

statutory beneficiaries of the trust fund provisions contained within Article 3-A of the New York Lien Law and other sources of trust fund obligations.

27.    Nonetheless, because the Forbearance and Standstill Agreement that would have permitted Gramercy to access the BOA Facility was never finalized pre-petition, Gramercy inquired with BOA regarding post-petition financing.  BOA has not provided Gramercy with a proposal for post-petition financing.  Gramercy has also solicited terms for post-petition financing from a non-traditional lender, however it did not receive a proposal in a manner that would meet its immediate funding needs.

28.    Further, due to the ongoing coordination with Everest regarding Gramercy's continued performance of work on the Everest Bonded Projects which represent the majority of Gramercy's open work, and Everest's ongoing exposure and obligations under the Bonds related thereto, partnering with Everest presented Gramercy with the best available option.  Awaiting a lengthy loan and commitment approval process from a traditional lender was simply not an option based on Gramercy's immediate need for funding to continue work without disruption for the benefit of the owners, general contractors and other counterparties on all of its construction projects.

29.    Finally, after several weeks of arm's length negotiations and detailed analysis by Everest and its consultants of Gramercy's operations and finances, Gramercy reached an agreement with Everest whereby Everest has agreed to provide Gramercy  with the DIP Facility on the terms set forth in the DIP Financing Agreement.

**E.**    **Summary of Terms of DIP Facility**

30.    In accordance with the terms and conditions of the DIP Financing Agreement, Everest has agreed to provide financing in the aggregate amount of up to four million ($4,000,000)

dollars (the "DIP Facility") which incorporates an Initial Advance of seven hundred fifty thousand ($750,000) dollars and one or more Subsequent Advances totaling up to three million two hundred fifty thousand ($3,250,000) dollars.  The DIP Facility is subject to Funding Requests in accordance with a Budget, which Funding Requests will be disbursed upon approval by Everest to the Everest Bonded Contracts DIP Account for Permitted Uses in the absence of a DIP Financing Default. The DIP Facility shall be used for costs associated with the Everest Bonded Projects and for specific Permitted Uses under the DIP Financing Agreement.

*(i)*    *Everest Collateral for DIP Financing and Surety Bonds*

31.    Pursuant to the DIP Financing Agreement, as partial consideration for Everest agreeing to provide Gramercy with the DIP Facility and the execution or consideration of the execution of surety bonds, Gramercy and the non-debtor Indemnitors have agreed to pledge their interests in the following real and personal property (collectively, the "Collateral") as security for Gramercy's obligation to repay all obligations to Everest :

- The interest of 3000 Burns the commercial real property commonly known as 3000 and 3004 Burns Avenue, Wantagh, New York, in the amount of $4,000,000, as evidenced and secured by a Demand Note and Mortgage;
- The interests of Vincent Parziale and Joanna Parziale in certain residential real property in the amount of the lesser of a) $6,000,000 or b) amounts due or to become due from the Indemnitors to Everest under the Indemnity Agreement, as evidenced and secured by a Demand Note and Mortgage;
- The Everest Bonded Contracts Lien on all of the proceeds of the Everest Bonded Contracts; and
- The Second Lien in all other personal property assets owned by Gramercy.

32.    The Everest Bonded Contracts Lien and the Second Lien shall not extend to any causes of action for preferences, fraudulent conveyances and other avoidance power claims and causes of action arising under sections 542, 544, 545, 546, 547, 548, 549, 550 and 553 of the Bankruptcy Code and the recoveries or proceeds thereof (the "Avoidance Actions"). Gramercy has proposed that, to the extent the automatic stay of section 362 of the Bankruptcy Code is

applicable to any provision of the DIP Financing Agreement, Everest shall be granted relief from

the automatic stay on notice as set forth in paragraph H of the DIP Financing Agreement and such

grant of stay relief shall be included in the Final Order.

(ii)    *Everest Carve-Out*

33.    Gramercy has requested a carve-out from the Collateral being provided by

Gramercy to Everest (the "Everest Carve-Out") for:  (i) all fees required to be paid by the Clerk of

the Bankruptcy Court and to the Office of the United States Trustee or as determined by order of

the Court, pursuant to 28 U.S.C. § 1930(a) and 31 U.S.C. § 3717; (ii) all reasonable fees and

expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and

(iii) all unpaid fees and expenses incurred by persons or firms retained by Gramercy pursuant to

section 327, 328, or 363 of the Bankruptcy Code, to the extent allowed by the Court, up to an

aggregate maximum amount to be determined.   Gramercy has further requested that the Everest

Carve-Out be in addition to any carve-out given by BOA (the "BOA Carve-Out") and to any of

Gramercy's rights under section 506(c) of the Bankruptcy Code to the extent that those rights relate

to the Everest Bonded Contracts Lien and the Second Lien (and not collateral provided to Everest

by non-debtor Indemnitors); however, the maximum amount of the Everest Carve-Out, including

any claims under Section 506(c) of the Bankruptcy Code relating to Everest's Collateral in the

bankruptcy case, would in no event exceed an amount to be determined upon agreement of the

parties.  Gramercy has further proposed that the Everest Carve-Out be in addition to Gramercy's

rights under section 506(c) of the Bankruptcy Code, provided that the maximum amount of the

Everest Carve-Out and Gramercy's rights under section 506(c) of the Bankruptcy Code may not exceed an amount to be determined upon agreement of the parties.

34.    Having been unable to reach agreement on an amount of the Everest Carve-Out to be applicable for all purposes, Gramercy has alternatively proposed that the Everest Carve-Out apply only upon the occurrence of a DIP Financing Default.  To date, Gramercy and Everest have been unable to reach agreement regarding the terms of the Everest Carve-Out, as well as whether the Everest Carve-Out should only be triggered upon the occurrence of a DIP Financing Default.

(iii)    *Economic Terms of the DIP Facility*

35.    Everest has not charged any commitment fees, lender fees, unused line fees or exit fees in connection with the DIP Facility.  The DIP Loan Obligations bear interest at a rate of six and one quarter (6.25%) percent per annum and a default rate of an additional two (2%) percent payable upon and during the occurrence of a DIP Financing Default.  The DIP Facility terminates upon the later to occur of: (a) the effective date of a confirmed plan in this chapter 11 case; or (b) the date of indefeasible payment in full of all obligations due under the DIP Financing Agreement in accordance with the terms thereof; but in any event not later than one (1) year from the Effective Date of the DIP Financing Agreement, unless otherwise extended in writing by the parties thereto.

**RELIEF REQUESTED**

36.    Everest has agreed to provide the DIP Facility to Gramercy pursuant to the DIP Financing Agreement which will be used to provide Gramercy with (i) the liquidity required to fund its operations while it continues performing work on its open construction projects and (ii) a potential source of future surety bonds so that it can continue to bid for new work and maintain its contract pipeline for the benefit of all creditors of the estate.  By this Motion, Gramercy respectfully requests entry of interim (Exhibit 1) and final orders:

(a)    authorizing Gramercy to obtain the DIP Facility on the terms and conditions set forth in the DIP Financing Agreement annexed hereto as Exhibit 2 and to borrow up to four million ($4,000,000) dollars thereunder;

(b)    authorizing the immediate funding under the DIP Financing Agreement in the aggregate amount of seven hundred fifty thousand ($750,000) dollars on an interim basis in order to avoid immediate and irreparable harm to Gramercy's estate;

(c)    granting Everest, pursuant to section 364(d)(1) of the Bankruptcy Code, the first priority Everest Bonded Contracts Lien on all of the proceeds of the Everest Bonded Contracts;

(d)    granting Everest, pursuant to section 364(c)(3) of the Bankruptcy Code, the Second Lien in all other personal property assets owned by Gramercy;

(e)    authorizing Gramercy's use of Cash Collateral subject to the Everest Bonded Contracts Lien on the terms and conditions set forth in the DIP Financing Agreement and the Interim Order;

(f)    granting adequate protection to BOA in the form of periodic monthly and other payments on the terms and conditions set forth herein and the Interim Order; and

(g)    scheduling the Final Hearing to consider entry of a Final Order authorizing any requested relief not granted under the Interim Order on a final basis.

37.    For the avoidance of doubt, and consistent with the relief granted on an interim basis in connection with the Cash Collateral Motion, all of the relief requested herein is subject to any valid rights under certain statutory and/or contractual trusts to the extent provided for under applicable non-bankruptcy law, including, without limitation, trusts under (a) Article 3-A of the New York Lien Law, (b) contracts bonded by Arch or Everest, or (c) indemnity agreements executed by Gramercy (and others) in favor of Arch or Everest, as well as Arch's and Everest's respective rights of equitable subrogation, if any.  In addition, the Everest Bonded Contracts Lien and the Second Lien is intended to be subject to the Everest Carve-Out on terms to be agreed to by the parties and/or otherwise ordered by the Court.

**BASIS FOR RELIEF REQUESTED**

I.    **Gramercy Should be Authorized to Obtain the DIP Facility Through the DIP Financing Agreement**

        A.    **Entry into the DIP Financing Agreement is an Exercise of the Debtor's Sound Business Judgment**

38.    Gramercy submits that it should be authorized, in the exercise of its sound business judgment, to enter into the DIP Financing Agreement and obtain access to the DIP Facility pursuant to the provisions of section 364 of the Bankruptcy Code described below.

39.    Courts grant debtors significant deference in acting in accordance with their sound business judgment in obtaining post-petition secured financing, so long as such financing does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (nothing that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

40.    To determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).  Here, Gramercy's decision to enter into the DIP Financing Agreement is an exercise of its sound business judgment

that warrants approval by the Court.  Gramercy and its advisors undertook a detailed investigation as to Gramercy's projected financing needs during the chapter 11 case and determined that Gramercy would require postpetition financing to ensure the completion of its construction projects without disruption.  Indeed, the DIP Facility will provide Gramercy with access to funding to pay employees, vendors, subcontractors, materialmen and service providers, while also supplying liquidity to give Gramercy's project owners the comfort and confidence required to stabilize operations.  Moreover, and significantly, the DIP Financing Agreement and related Collateral provided thereunder provides for the issuance of a bond and Everest's consideration of the execution of additional bonds.  Additional bonding capacity and the ability to bid on new work is critical to Gramercy's viability and the significance at this critical time cannot be underscored.

41.     Given Gramercy's current financial position, the ongoing thirty (30) projects and its desire to continue working on all of its projects without disruption, Gramercy worked to secure financing that would support Gramercy's chapter 11 goals of preserving the company and its value. Accordingly, after extensive discussions by Gramercy and its advisors with Everest, Gramercy negotiated the DIP Financing Agreement with Everest in good faith and at arm's-length to obtain the required post-petition financing on the best and only terms available to Gramercy. Thus, Gramercy submits that entry into the DIP Facility constitutes an exercise of Gramercy's sound business judgment that should be approved by the Court.

**B.     The Terms of the DIP Facility Should be Approved**

42.     Gramercy proposes to obtain financing under the DIP Facility by providing Everest with security interests and liens on the terms set forth in the DIP Financing Agreement.

*The Everest Bonded Contracts Lien and Adequate Protection in Favor of BOA Should be Approved*

43.     Courts may authorize a debtor to obtain post-petition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1).  Here, Gramercy seeks authority to enter into the DIP Financing Agreement which will provide Everest with the Everest Bonded Contracts Lien, representing a first priority perfected lien against and security interest in, the proceeds of the Everest Bonded Contracts, notwithstanding the fact that such proceeds (to the extent not subject to trust fund obligations) comprise a portion of BOA's Pre-Petition Collateral as of the Petition Date.  BOA has consented to the imposition of the Everest Bonded Contracts Lien in exchange for adequate protection on the terms set forth herein.

44.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets.  Courts consider a number of factors, including:

   a.     whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

   b.     whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's business;

   c.     whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender;

   d.     whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

e.    whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37-39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 879-80, *cited in* Transcript of Record at 733:3-7, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 1, 2009); *Barbara K. Enters.*, 2008 WL 2439649, at *10; *see also* 3 *Collier on Bankruptcy* ¶ 364.04[1] (15th ed. rev. 2008).

45.    The DIP Facility satisfies these factors.  First, Gramercy does not believe that financing on less onerous terms would be available based on the illiquid nature of Gramercy's assets and the trust fund obligations imposed on its contract receivables under the Lien Law, both of which make traditional bank financing difficult to procure.  Gramercy, despite efforts made with Bank to enter into a Forbearance and Standstill Agreement prior to the Petition Date, did not receive a proposal for financing from Bank, its pre-petition lender.  Aside from the lack of traditional third party lenders, there are few lenders with the financial wherewithal or willingness to extend the DIP Facility on a short term basis to meet Gramercy's backstop financing needs on its projects given the favorable economic terms of the DIP Facility.  Moreover, given Gramercy's obligations to Everest and Arch under their Indemnity Agreements, if Gramercy was to pursue alternative financing, Everest and Arch would likely object to the terms of any financing that would impact its interest in the proceeds of the their bonded contracts, thereby requiring Gramercy to proceed with a costly, contested and likely protracted proceeding.

46.    Gramercy further submits that the DIP Facility on the terms set forth in the DIP Financing Agreement is necessary to preserve estate assets and enable Gramercy to continue its business operations for the benefit of all creditors and parties in interest.  As set forth above, Gramercy further submits that the terms of the proposed financing are reasonable and adequate

under the circumstances, particularly in light of the fact that the DIP Financing Agreement contemplates financing and bonding and the consideration of future bonding.

47.     After extended, good faith and arm's length negotiations, Everest agreed to provide the DIP Facility on the terms provided in the DIP Financing Agreement and as summarized above. Notably, the DIP Facility carries what Gramercy believes to be a reasonable interest rate and does not contain any of the fees and charges traditionally associated with debtor-in-possession financing. Because the DIP Facility proceeds are critical to Gramercy's operations and successful exit from chapter 11 and the DIP Financing Agreement also contemplates future bonding, and because Everest would not have agreed to provide financing without the protections afforded by the DIP Financing Agreement, Gramercy believes that the terms of the DIP Facility are reasonable under the circumstances.

48.     A debtor may obtain post-petition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B); *In re 354 E. 66th St. Realty Corp.*, 177 B.R. 776, 782 (Bankr. E.D.N.Y. 1995) ("The purpose or intent of granting adequate protection payments are to maintain the status quo for that creditor and to protect the creditor from diminution or loss of the value of its collateral during the ongoing Chapter 11 case.").

49.     Adequate protection may be provided in various forms, and what constitutes adequate protection is decided on a case-by-case basis. *See*, *e.g.*, *In re Realty SW Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is

protection of the secured creditor from diminution of the value of its collateral during the

reorganization process"); *495 Central Park Ave. Corp.*, 136 B.R. at 631 (same).

50.     Here, Gramercy has agreed to the following adequate protection in favor of BOA:

- Monthly periodic payments to BOA in a total sum equal to thirty thousand ($30,000) dollars plus the amount of regularly scheduled fees due under letters of credit (as and when due)[6], to be applied to the amounts outstanding under the BOA Facility
- Perfection of first priority lien on any equipment not currently covered by BOA's pre-petition lien

51.     Gramercy and BOA have agreed that the foregoing is adequate under the

circumstances of the case.

### *The Second Lien Should be Approved*

52.     Section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court,

after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an

administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur

debt:

1)   with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];

2)   secured by a lien on property of the estate that is not otherwise subject to a lien; or

3)   secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. §364(c).

53.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need

only demonstrate "by a good faith effort that credit was not available" to the debtor on an

unsecured or administrative expense basis.  *See Ames Dept. Stores,* 115 B.R. at 37; *In re 495*

---

[6] Such fees include a (i)  2% per annum letter of credit fee, (ii) the annual administrative fees applicable thereto, and (iii) and any draw fees, all of which will be paid as and when they would be due in the ordinary course.

*Central Park Avenue Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992).  Although ''[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable'', the statute does obligate a debtor to show "by a good faith effort that credit is not available without a senior lien."  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re YL West 87th Holdings I, LLC*, 423 B.R. 421, 441 n.44 (Bankr. S.D.N.Y. 2010) (noting that courts require only a showing of "reasonable efforts" to obtain credit otherwise).  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, ''it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing.''  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989).

54.     Gramercy sought, but was unable to obtain, the required funds in the form of unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, pursuant to section 364(a) or (b) of the Bankruptcy Code.

55.     The Court should therefore authorize Gramercy to (a) provide Everest with the Everest Bonded Contracts Lien on the proceeds of the Everest Bonded Contracts and (b) provide Everest with the Second Lien on all other personal property owned by Gramercy.  Notably, the non-debtor Indemnitors including Gramercy's sole shareholder and principal Vincent Parziale and his spouse, as well as 3000 Burns, have agreed to post significant Collateral for the benefit of Gramercy to secure the DIP Facility and the surety bonding contemplated under the DIP Financing Agreement.  Accordingly, the terms of the DIP Financing Agreement inure to the benefit of

creditors of the estate because much of the Collateral to support the infusion of funds and support for the consideration of future bonding is being provided by non-debtor sources and therefore not impacting the rights of estate creditors.

### C.    Everest Should Be Deemed a Good Faith Lender Under Section 364(e) of the Bankruptcy Code

56.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loan or grant such lien is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incurred debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt or the granting of such priority or lien were stayed pending appeal.

11 U.S.C. §364(e).

57.    The DIP Financing Agreement is the result of Gramercy's reasonable and informed determination that Everest offered favorable, fair market terms on which to obtain needed post-petition funding, and of extended arm's length good faith negotiations between Gramercy and Everest. The terms and conditions of the DIP Financing Agreement are fair and reasonable and the proceeds under the DIP Facility will only be used for purposes that are permissible under the Bankruptcy Code.

58.    Accordingly, Gramercy submits that the Court should find Everest to be a good faith lender within the meaning of section 364(e) of the Bankruptcy Code entitled to the protections afforded by that section.

## II.    The Debtor Should be Authorized to Use Cash Collateral[7]

59.    For the reasons set forth herein, Gramercy requires use of Cash Collateral in the form of the receivables from the Everest Bonded Projects that are subject to the Everest Bonded Contracts Lien to fund daily operations.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless –
>
> (A)  each entity that has an interest in such cash collateral consents; or
> (B)  the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

60.    Further, section 363(e) of the Bankruptcy Code provides for adequate protection of an entity's interest in property upon request.  11 U.S.C. § 363(e).  Gramercy submits that it has satisfied the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code and should be authorized to use the Cash Collateral because Everest has consented to Gramercy's use of Cash Collateral on the terms set forth in the DIP Financing Agreement.  In addition, Everest has not requested additional adequate protection.

61.    In light of the adequate protection provided to Everest in the form of the Collateral proposed to be granted under the DIP Financing Agreement, including without limitation the Second Lien which is not subject to Gramercy's Cash Collateral use, Gramercy has appropriately provided for any diminution in the value of the Everest Bonded Contracts Lien on Cash Collateral. Accordingly, Gramercy believes that the adequate protection proposed herein and in the Interim

---

[7] All other requests for the use of Cash Collateral are subject to the terms of the Cash Collateral Motion and related interim orders of the Court.

Order is fair, reasonable, and sufficient to satisfy the requirements of section 363(c) of the Bankruptcy Code.

### III. Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm to the Debtor's Estate

62.     The Court may grant interim relief in respect of a motion filed pursuant to section 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2) and (c)(2). In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. *See, e.g., Ames Dep't Stores*, 115 B.R. at 36.

63.     Given Gramercy's immediate cash needs for the Initial Advance in the week ending June 14, 2019 as set forth in the Budget, Gramercy and its estate will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly. Gramercy requires access to the proceeds of the Initial Advance in the amount of seven hundred fifty thousand ($750,000) under the DIP Facility to fund essential business operations, and if the Court does not approve interim access to the DIP Facility to enable Gramercy to receive the Initial Advance, it will be unable to meet its payment obligations in the normal course of business.

64.     Accordingly, Gramercy has an immediate need for access to liquidity to, among other things, satisfy payment obligations and permit the orderly continuation of the operation of its business, to maintain business relationships with project owners, subcontractors and suppliers, and to satisfy other essential operational needs, all of which are required to preserve and maintain Gramercy's value for the benefit of all parties in interest. Gramercy therefore requests authority to borrow funds under the DIP Facility on an interim basis pending the Final Hearing.

65.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in similar circumstances. *See, e.g., In re Décor Holdings Inc.*, Case No. 19-71020 (REG) (Bankr. E.D.N.Y. Feb. 20, 2019); In re Seasons Corporate, LLC, Case No. 18-45284 (NHL) (Bankr. E.D.N.Y. Sept. 18, 2018); *In re Federation Employment and Guidance Service, Inc. d/b/a FEGS,* Case No. 15-71074 (REG) (Bankr. E.D.N.Y. May 6, 2015); *In re Personal Communications Devices, LLC*, Case No. 13-74303 (AST) (Bankr. E.D.N.Y. Aug. 21, 2013); *In re Interfaith Medical Center, Inc.*, Case No. 12-48226 (CEC) (Bankr. E.D.N.Y. Sept. 30, 2013); *In re Global Aviation Holdings, Inc.*, Case No. 12-40783 (CEC) (Bankr. E.D.N.Y. March 1, 2012); *In re United Retail Group, Inc.*, Case No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 2, 2012); *In re Insight Health Servs. Holdings Corp.*, Case No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011); *In re NR Liquidation III Co. (f/k/a Neff Corp.)*, Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010); *In re Reader's Digest Ass'n*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009); *In re Gen. Growth Prop. Inc.*, Case No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009); *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009); *In re Lenox Sales, Inc.*, Case No. 08-14679 (S.D.N.Y. Nov. 25, 2008); *In re Wellman, Inc.*, Case No. 08-10595 (S.D.N.Y. Feb. 27, 2008).

66.     Accordingly, for all of the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to Gramercy's estate and is consistent with, and warranted under, Bankruptcy Rule 4001(c)(2).

#### IV.    **Request for Final Hearing**

67.    Pursuant to Bankruptcy Rule 4001(c)(2), Gramercy requests that the Court (a) schedule the Final Hearing as soon as practicable, and (b) fix the time and date for parties to file objections to the Motion in advance of the Final Hearing.

#### V.    **Request for Waiver of Stay**

68.    Gramercy further seeks a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court others otherwise."  As set forth above, the relief requested herein is essential to prevent irreparable damage to the value of Gramercy's estate. Accordingly, the relief requested herein is appropriate under the circumstances and under Bankruptcy Rule 6004(h).

**NOTICE**

69.    Notice of this Motion has been given to (a) the United States Trustee for the Eastern District of New York; (b) Gramercy's twenty (20) largest unsecured creditors; (c) Counsel to Bank of America, N.A; (d) Counsel to Everest National Insurance Company; (e) Counsel to Arch Insurance Company; (f) any known parties asserting a lien against any portion of the Collateral; (g)  the Internal Revenue Service; (h) the Securities and Exchange Commission; (i) the United States Department of Justice; and (j) any other party who requests to receive notices.  Gramercy submits that, under the circumstances, no other or further notice is required.

70.    No previous application for the relief sought herein has been made to this or any other Court.

## <u>CONCLUSION</u>

**WHEREFORE**, for the reasons set forth herein, Gramercy respectfully requests that the Court (a) enter an order granting the relief requested herein; and (b) grant Gramercy such other and further relief as the Court deems just and proper.

Dated: Garden City, New York
      June 7, 2019

CULLEN AND DYKMAN LLP

By:      */s/ Elizabeth M. Aboulafia*
          C. Nathan Dee, Esq.
          Elizabeth M. Aboulafia, Esq.
          100 Quentin Roosevelt Boulevard
          Garden City, New York 11530
          (516) 357-3700

          *Proposed Special Counsel to Gramercy*
          *Group, Inc.*

**Exhibit 1**

**INTERIM ORDER**

**[TO BE FILED PRIOR TO HEARING]**

**<u>Exhibit 2</u>**

**DIP FINANCING AGREEMENT**


**[TO BE FILED PRIOR TO HEARING]**